IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TAWANNA YOUNG, | Case No.: _____ |
| Plaintiff, | Judge: _____ |
| v. | |
| OHIO DEPARTMENT OF PUBLIC SAFETY - OHIO STATE HIGHWAY PATROL, | (Jury Demand Endorsed Herein) |
| Defendants. | |

**COMPLAINT FOR DAMAGES**

INTRODUCTION

1. Plaintiff Tawanna Young brings this civil action the Ohio Department of Public Safety - Ohio State Highway Patrol (OSHP), for violations of the Americans with Disabilities Act (ADA) and the Age Discrimination in Employment Act (ADEA), arising from a pattern of unlawful discrimination, harassment, and retaliation.

2. Plaintiff has dedicated over two decades to public service as a State Trooper for the OSHP, consistently performing her duties with distinction. Despite her exemplary record, she was subjected to adverse employment actions designed to undermine her career, including repeated psychological evaluations, denial of advancement, and forced removal from duty without cause.

3. These actions were taken in retaliation for Plaintiff's good-faith reports of discrimination, her participation in protected activity, and her refusal to remain silent in the face of misconduct. Defendant used the return-to-work and fitness-for-duty processes not as tools of safety or necessity, but as mechanisms of reprisal and exclusion.

JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as it arises under federal law, specifically the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12101 et seq., the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq., and related federal civil rights statutes.

5. Plaintiff has satisfied all administrative prerequisites to suit under the ADA and ADEA. On February 12, 2025, the U.S. Department of Justice issued a Notice of Right to Sue to Plaintiff in connection with her charge of discrimination under the ADA. That notice authorizes Plaintiff to bring this civil action within 90 days.

6. With respect to Plaintiff's ADEA claims, the EEOC issued formal notice on February 13, 2025, that it had closed its file and terminated processing of the charge. Under EEOC policy and federal law, no right-to-sue letter is required to pursue ADEA claims against public employers. Plaintiff is filing this action within the 90-day period following that administrative closure.

7. Plaintiff also included claims under Title VII of the Civil Rights Act of 1964 in her EEOC charge. Those claims remain under review by the U.S. Department of Justice, which has not yet issued a right-to-sue letter with respect to Title VII. Plaintiff does not assert a Title VII cause of action at this time, but reserves the right to seek leave to amend her complaint should the DOJ issue such authorization.

8. Venue is proper in the United States District Court for the Southern District of Ohio, Eastern Division, pursuant to 28 U.S.C. § 1391(b), because the events giving rise to the claims occurred in this District, and Defendant resides and conducts business within this jurisdiction.

PARTIES

9. Plaintiff Tawanna Young is a U.S. citizen and former OSHP Trooper who resides in Ohio. She is over 40 years old.

10. Defendant, OSHP, is an Ohio State Agency charged with the responsibility of enforcing traffic and criminal laws on public roadways and on state-owned or leased property within Ohio and an employer within the meaning of federal and Ohio law.

FACTUAL ALLEGATIONS

11. Plaintiff Tawanna Young is a veteran law enforcement officer who served for more than 20 years with the Ohio State Highway Patrol ("OSHP").

12. In 2022, Plaintiff participated in a sexual harassment complaint against OSHP. That matter was resolved through an out-of-court settlement.

13. Following the resolution of the sexual harassment complaint, Plaintiff began to notice a change in how supervisors and coworkers treated her. She felt increasingly excluded from workgroup discussions, denied support in the field, and spoken to differently than her male counterparts.

14. Plaintiff came to believe that her participation in the sexual harassment complaint had made her a target and that OSHP leadership wanted to push her out of the agency.

15. In early 2023, Plaintiff came under the supervision of Sergeant Timothy Markowski, with whom she had a strained professional history. Years earlier, Markowski had attempted to have Plaintiff reassigned to another post, though she remained at the Lancaster location.

16. When Markowski resumed supervisory responsibilities at the Lancaster Post, tensions quickly resurfaced. He began asking Plaintiff to give up her night shift assignment, despite her seniority.

17. On multiple occasions in May and June 2023, Markowski told Plaintiff that he wanted to reassign the night shift to younger troopers and encouraged her to step down.

18. During those discussions, Markowski referred to Plaintiff as "old and crusty." These comments were made in front of others and were repeated over time.

19. Plaintiff declined to relinquish her shift and continued reporting to duty as scheduled.

20. In or around May 2023, while Plaintiff was handling a DUI traffic stop, the suspect and passengers became verbally abusive toward her. The suspect repeatedly called Plaintiff a "dirty cop" and used other profanities directed at her.

21. Sergeant Markowski was present on scene during the stop and stood nearby as the verbal abuse occurred.

22. At no time did Markowski instruct the passengers to leave or intervene to de-escalate the harassment.

23. At one point, when the suspect again called Plaintiff a "dirty cop," Markowski responded, "I know."

24. The lack of response by Plaintiff's supervisor during the traffic stop followed a pattern of conduct that had developed after Markowski assumed supervision over Plaintiff's shift.

25. On May 15, 2023, Plaintiff submitted a formal internal complaint against Markowski, citing the repeated verbal abuse, shift interference, and other incidents she found discriminatory and harassing.

26. Around the same time, Markowski referred to Plaintiff as a "snake bitch" while in the dispatch area. This statement was made in front of Trooper Jeremy Knowlton.

27. In July 2023, Plaintiff found a paper snake and a mock disciplinary slip referencing "excessive snakage" in her mailbox. The slip listed Trooper Clarke Frantz as the issuing officer and Markowski as the recipient.

28. A few days later, Plaintiff discovered rubber snakes around her locker, including one wrapped around a flagpole leaned against her locker door.

29. Plaintiff reported the incident directly to Markowski in the presence of Knowlton. Markowski laughed and said he would write an Interoffice Communication (IOC) telling "whoever was doing it" to stop. No action was taken.

30. Not long after, Plaintiff spoke with Sergeant Timothy Bullock about the snakes. Bullock admitted that he had made the snakes but denied placing them in her locker or mailbox.

31. In December 2023, Plaintiff reported Markowski again—this time for ordering her to file DUI and hit-skip charges against a driver she could not place behind the wheel. She had already voided her citation due to insufficient evidence.

32. Markowski voided the citation without informing Plaintiff and claimed the Fairfield County Prosecutor's Office insisted on charges because an off-duty CPD officer had been hit.

33. Plaintiff refused to issue the charges and contacted the union. Within days, she learned that Markowski had been transferred to the Statehouse.

34. Following the transfer, Lieutenant Michael Akers—who was close with Markowski—became hostile toward Plaintiff.

35. In early December 2023, Plaintiff requested to shadow Sergeant Rusty Lanning as part of the required steps in the sergeant promotional process. Under OSHP policy, candidates seeking promotion must complete a shadowing assignment with a Sergeant Training Officer (STO)—a specifically designated sergeant who is trained and authorized to provide mentorship and performance evaluation during the shadowing period.

36. The purpose of this requirement is to ensure that candidates gain meaningful insight into the supervisory role under the guidance of someone formally recognized by the agency as a training officer.

37. However, when Plaintiff made the request, Lieutenant Michael Akers deliberately misled her. He told her she needed to shadow a "mentor" rather than an STO. This was false. Akers stated, "Mentors were created by the Patrol for a reason—just pick one from the list." Plaintiff, who had reviewed the promotional guidelines, knew that shadowing a mentor alone would not qualify her for credit toward attending the assessment center.

38. Despite knowing the policy—especially given that two troopers under Akers' direct supervision (Trooper Madison Moore and Trooper Clarke Frantz) had completed the same process correctly just months prior—Akers continued to insist that Plaintiff was wrong. His misdirection delayed her advancement, discredited her knowledge, and discouraged her from pursuing promotion altogether.

39. On the evening of December 9, 2023, Plaintiff stopped at the scene of a crash on State Route 256 in Pickerington and spoke with Lieutenant Akers. She corrected him about the shadowing requirement, and he became visibly irritated.

40. When Plaintiff arrived at the Lancaster Post later that same evening on December 9, 2023, Sergeant Timothy Markowski was present. As she entered the building and made her way through the common area, Markowski was on a phone call with Lieutenant Michael Akers.

41. Without explanation, Markowski placed the call on speakerphone in a public area of the post, allowing Plaintiff—and anyone nearby—to hear the conversation.

42. Plaintiff immediately recognized Akers' voice. During the call, Akers made several disparaging comments about Plaintiff. She distinctly heard him say, "I'm tired of her," followed by, "We need to get her on a mental leave." The statement was not made in jest. Plaintiff observed that it was delivered with irritation and clear intent. Markowski made no effort to turn off the speaker or warn Akers that others could hear him.

43. Plaintiff immediately shared the incident with her husband, Sergeant Jermaine Thaxton, and documented what had occurred. This comment would later be reported to Sergeant Chad Bass during an internal interview in June 2024, but no follow-up questions were asked, and no action was taken to investigate or address the remark.

44. On December 10, 2023, Plaintiff texted Larry Phillips from the OSTA Union and provided screenshots of the promotional requirements that proved Lanning was an eligible STO.

45. On December 11, 2023, Plaintiff spoke with Leiann Licottie, who confirmed that shadowing an STO—not a mentor—was required for assessment center eligibility.

46. On December 12–14, 2023, Plaintiff shadowed Sergeant Lanning for three consecutive days.

47. During that time, while in the sergeant's office with Akers and Lanning, Akers told Plaintiff she took "this sergeant stuff too seriously" and suggested she should retire "due to stress" after mentioning that another female over 50 years old that they both knew had recently passed away.

48. On January 17, 2024, Plaintiff began noticing low-flying aircraft near her vehicle and hovering near her home while off duty.

49. In early February 2024, Plaintiff overheard Sergeant Heath Strawser tell Sergeant Brown in the sergeant's office that someone from the aviation unit who had been on disability was returning to participate in "Operation T detail."

50. Plaintiff informed her husband, Sergeant Jermaine Thaxton, who advised her to document the sightings and not report them yet.

51. On March 7, 2024, Plaintiff attempted to contact Colonel Charles Jones twice by phone to report the ongoing aircraft surveillance. When he did not answer, she sent him a text

message describing the situation. Colonel Jones did not return the calls or respond to the message.

52. By March 13, 2024, low-flying aircraft surveillance was sighted by Sergeant Thaxton as well. Plaintiff documented the sightings and submitted videos and pictures to the union.

53. That night, Plaintiff noted that the aviation unit publicly announced it was flying in the Lancaster area around 10:15 PM. She reported the encounter to newly promoted Sergeant Scott Maul, who laughed and told her to ignore it.

54. Plaintiff was later told by Sergeant Chad Bass that she had no option but to report the aircraft formally, even though she expressed her reluctance.

55. On April 2, 2024, Plaintiff notified Bass and reiterated that she did not want to report the aircraft because she believed no one would help her.

56. On May 14, 2024, Plaintiff was interviewed for over an hour by Sergeant Bass about the aircraft incidents. She also discussed the mental leave comment made by Akers but no follow-up questions were asked.

57. On June 14, 2024, Plaintiff was interviewed again. Bass showed her paperwork from the aviation unit, which stated the aircraft was "too high up, up by the moon." Plaintiff recognized this phrase as matching the altitude she had consistently described.

58. Bass insisted OSHP aircraft had only flown twice and denied any further involvement. He told Plaintiff OSHP could not help identify other aircraft. When pressed, he said, "Unless aviation is lying to me."

59. On July 24, 2024, Plaintiff filed a formal Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (EEOC), alleging discrimination and retaliation on the basis of age, race, and sex.

60. After receiving notice of the charge, Defendant made no effort to address the allegations or prevent further harm. Instead, Plaintiff continued to experience retaliation. Supervisors and leadership grew more hostile, and workplace conditions became increasingly adversarial.

61. On August 15, 2024, Plaintiff was informed by Larry Phillips of the OSTA Union that the EEOC had officially moved her charge out of the mediation phase and into investigation status.

62. That same day, Plaintiff and her husband, Sergeant Jermaine Thaxton, were placed on administrative leave and were ordered to undergo psychological evaluations as a condition of returning to duty.

63. According to Phillips, Staff Lieutenant Aaron Williams claimed the couple had failed to provide any video evidence of aircraft surveillance—despite Plaintiff having submitted multiple videos and photos, as well as witness statements and detailed logs, beginning as early as March 13, 2024.

64. The leave notice came less than four weeks after the EEOC charge was filed and less than 24 hours after it advanced to investigation. Plaintiff immediately recognized the timing as retaliatory and consistent with what Lieutenant Akers had threatened when he said he wanted to "get her on a mental leave."

65. OSHP never cited any workplace misconduct or behavioral concerns to justify the mental evaluations. At no point did Plaintiff request accommodations related to mental health or show any signs of instability at work. On the contrary, she was handling critical duties, including serious crash investigations, up until the day she was removed.

66. Following the forced administrative leave order on August 15, 2024, Plaintiff and her husband were scheduled for fitness-for-duty psychological evaluations. These were not

optional—OSHP leadership made clear that they would not be permitted to return to duty without undergoing the evaluations.

67. Plaintiff's initial psychological evaluation was conducted on or about September 3, 2024. Her husband's evaluation occurred the following week, on or about September 10, 2024.

68. Neither officer was accused of misconduct or erratic behavior. Both had remained fully capable of performing their respective law enforcement duties, including high-stress field operations, up until the day they were removed from active service.

69. The evaluations were ordered unilaterally and without a referral from a treating provider or any documented workplace incident that would justify a mental fitness concern.

70. The evaluator who conducted Plaintiff's exam was not OSHP's regular psychological consultant but an outside provider chosen without explanation. Plaintiff was given minimal notice and no opportunity to consult with counsel in advance.

71. The tone of the evaluation was accusatory. The focus was not on Plaintiff's mental health history or current functioning, but on her reports of aircraft surveillance and harassment.

72. Dr. Otto Kausch, M.D., a board-certified psychiatrist with over 30 years of clinical and forensic psychiatric experience, evaluated Plaintiff on September 21, 2024, at his Akron office.

73. In a letter dated September 24, 2024, Dr. Kausch opined, with reasonable medical certainty, that Plaintiff did not suffer from any mental disorder, was not psychotic, was not delusional, and posed no danger to herself, her colleagues, or the public. He further concluded that Plaintiff was fit to return to duty without restrictions.

74. Shortly thereafter, Dr. Kausch informed Plaintiff that he had been contacted directly by a representative from Defendant's Human Resources Department, who provided him with "additional information" and specifically requested that he reconsider or amend his report.

75. On September 28, 2024, Dr. Kausch issued a second letter indicating that after reviewing an internal investigative report from OSHP and attempting unsuccessfully to re-interview Plaintiff, he was rescinding his previous clearance and could no longer offer an opinion "within reasonable medical certainty" about her fitness for duty.

76. In addition to Dr. Kausch's evaluation, Plaintiff underwent a separate psychological evaluation conducted by Joseph Catania, LISW, a licensed independent social worker. Mr. Catania reviewed Plaintiff's records and interviewed her independently. He issued a written opinion stating that Plaintiff was fit to return to work without restrictions and did not display any traits inconsistent with her role as a law enforcement officer.

77. On November 22, 2024, Larry Phillips relayed that OSHP told him Plaintiff could return to work if she stopped saying OSHP aircraft were following her.

78. In December 2024, Plaintiff Tawanna Young was informed by the Ohio State Highway Patrol (OSHP) that she was being completely removed from duty without pay and would not be permitted to return to work until she completed three to six months of psychotherapy and medication management.

79. This directive came despite multiple independent evaluations—by Dr. Otto Kausch and Joseph Catania, LISW—concluding that Plaintiff was mentally fit for duty, posed no danger to herself or others, and did not require psychiatric treatment.

80. Plaintiff was never diagnosed with any mental illness and never requested any psychological accommodation.

CLAIMS FOR RELIEF

**COUNT I – Violation of the Americans with Disabilities Act (42 U.S.C. § 12101 et seq. – Retaliation, Perceived Disability, Improper Fitness-for-Duty Evaluation)**

81. Plaintiff restates and incorporates all preceding paragraphs as if fully rewritten herein.

82. The Americans with Disabilities Act (ADA) prohibits employers from using medical examinations or disability-related inquiries unless they are job-related and consistent with business necessity. 42 U.S.C. § 12112(d)(4)(A).

83. The ADA also prohibits retaliation against employees who engage in protected activity, including reporting discrimination or participating in EEOC proceedings. 42 U.S.C. § 12203(a).

84. Plaintiff engaged in protected activity by reporting age, race, and sex-based discrimination; by opposing harassment; and by filing an EEOC charge on July 24, 2024, along with an amended EEOC charge on December 23, 2024 to include ADA violations after she was forced to undergo a fitness-for-duty exam.

85. Defendants were aware of Plaintiff's protected activity. On August 15, 2024, just days after the EEOC advanced her charge to investigation, OSHP forcibly removed Plaintiff from duty and ordered her to undergo a series of fitness-for-duty psychological evaluations, despite her clean performance records and like of prior mental health issues.

86. Defendants' actions constitute an adverse employment action, as Plaintiff was stripped of her pay, duties, and reputation under threat of termination if she did not comply with unjustified psychiatric treatment and further intrusive evaluations.

87. As confirmed in *Hall v. Crawford County JFS*, 188 N.E.3d 1138 (Ohio Ct. App. 2022), an employer's use of a fitness-for-duty exam can itself be discriminatory or retaliatory where the purpose is not truly medical but punitive or pretextual. *Hall* further held that a plaintiff need not prove they are disabled to challenge such an exam—only that the inquiry was unauthorized and not supported by business necessity.

88. Here, Plaintiff never exhibited any behavior suggesting she was unfit for duty, posed no threat to herself or others, and had been performing her job, including crash investigations

and DUI enforcement, without issue. Independent evaluations by Dr. Otto Kausch (on 9/21/24) and Joseph Catania, LISW concluded that Plaintiff was fit to return to duty without restrictions and exhibited no signs of psychosis, delusion, or instability.

89. Dr. Kausch later rescinded his clearance, not due to new clinical findings, but after being contacted directly by Defendant and provided with selectively curated internal documents. This interference directly undermines the medical independence required by ADA-compliant evaluations.

90. As in *Amesse v. Wright State Physicians, Inc.*, 105 N.E.3d 612 (Ohio Ct. App. 2018), an employer's request for a fitness-for-duty exam is only valid where the employee's performance is impaired, a direct threat is posed, or an accommodation is requested. None of those conditions were met here.

91. Moreover, Plaintiff's resistance to this process and her opposition to the evaluations constitute protected activity, just as in *Amesse*, where the court found a retaliation claim actionable even if based on the employee's good-faith belief of a violation.

92. The ADA's retaliation standard, as reaffirmed in *Pflanz v. City of Cincinnati*, 149 Ohio App.3d 743 (2002), only requires Plaintiff to show that: (1) she engaged in protected activity; (2) Defendants knew of it; (3) she suffered an adverse action; and (4) a causal connection exists. All four elements are present here.

93. Defendants weaponized the fitness-for-duty process not as a legitimate safety or operational necessity, but as a tool of retaliation in response to Plaintiff's protected activity, including her formal EEOC charge and internal complaints.

94. The sequence of events—beginning with derogatory remarks about Plaintiff's age and fitness for duty, followed by an overheard statement from Lieutenant Michael Akers in December 2023 that he wanted "to get her on a mental leave," and culminating in

Plaintiff's forced psychological evaluations and removal from duty—supports a reasonable inference that the actions taken by OSHP were not coincidental or medically required. Instead, these steps formed part of a deliberate course of conduct designed to cast doubt on Plaintiff's mental stability, exclude her from advancement, and discredit her as a law enforcement professional.

95. Defendants' asserted business judgment in mandating repeated evaluations and treatment is not shielded from scrutiny, particularly where the process was initiated and sustained in direct temporal proximity to protected complaints and amid statements by command staff suggesting a retaliatory motive.

96. As a result of Defendants' unlawful conduct, Plaintiff has suffered emotional distress, loss of income, reputational damage, and is now functionally barred from resuming her law enforcement career.

**COUNT II – Violation of the Age Discrimination in Employment Act (ADEA) and Ohio Revised Code § 4112.14 *(Disparate Treatment and Harassment Based on Age – 29 U.S.C. § 621 et seq.)***

97. Plaintiff restates and incorporates all preceding paragraphs as if fully rewritten herein.

98. The Age Discrimination in Employment Act (ADEA) prohibits discrimination against individuals 40 years of age or older in any aspect of employment, including hiring, promotion, discharge, compensation, or terms and conditions of employment. Plaintiff is a member of this statutorily protected class, having been born in 1977.

99. Plaintiff was 46 years old at the time she was subjected to a series of adverse employment actions, including denial of promotion, forced removal from duty, denial of pay, and coerced psychological evaluations—all of which occurred despite her exemplary job performance and qualifications.

100. Plaintiff was qualified for the position of sergeant, having met the shadowing and policy requirements. However, her requests to shadow an eligible Sergeant Training Officer were repeatedly obstructed by Lieutenant Michael Akers, who instead directed her to shadow a "mentor," despite knowing this would not satisfy the promotional requirements.

101. Younger troopers—including those who had recently joined the force—were afforded opportunities to shadow STOs, complete the assessment process, and receive advancement. Plaintiff was excluded from that pathway based on manufactured policy interpretations and misinformation.

102. In addition to being denied promotional opportunities, Plaintiff was repeatedly subjected to age-based harassment by Sergeant Timothy Markowski, who referred to her as "old and crusty" and questioned why she had not already retired. These comments were neither isolated nor benign. They were coupled with direct efforts to isolate Plaintiff, reassign her duties, and pressure her off her shift.

103. This conduct created a hostile work environment, as defined in *Surry v. Cuyahoga Community College*, 149 Ohio App.3d 528 (2002), where the court held that age-based slurs and targeted conduct can support a claim for workplace harassment. The harassment here was both severe and pervasive, and it unreasonably interfered with Plaintiff's ability to advance her career and perform her duties in peace.

104. As a result of Defendants' discriminatory and harassing conduct based on age, Plaintiff has suffered financial loss, emotional distress, reputational harm, and loss of career advancement.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court:

A. Enter judgment in her favor and declare that Defendants violated the ADA and ADEA;

B. Award all lost wages, benefits, and other compensatory damages to which she is entitled;

C. Order her reinstatement or award front pay in lieu of reinstatement;

D. Award punitive damages for the intentional, callous disregard of her rights;

E. Award emotional distress damages for the psychological harm caused by Defendants' campaign of harassment;

F. Award attorney's fees and litigation costs under 42 U.S.C. § 12205 and 29 U.S.C. § 626(b);

G. Grant such further relief as justice and equity require.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**/s/ Chanda L. Brown**
Chanda L. Brown (0081076)
Walton + Brown, LLP
395 East Broad Street, Suite 210
Columbus, Ohio 43215
Telephone: (614) 636-3476
Facsimile: (614) 636-3453
Email: cbrown@waltonbrownlaw.com
Attorney for Plaintiff